REGAN, Judge.
Plaintiff, Walter E. Bornemann, testamentary executor of the Succession of Mrs. Carla Hellmers Bornemann, instituted this suit against the defendant, Mrs. Loretto McKenna Richards, Jr., endeavoring to recover the sum of $6,600.00 [1], representing the amount deposited by the defendant when she signed the agreement to purchase the property, designated by the municipal number 1630 Arabella Street, from the succession of Bornemann. Plaintiff asserted that the defendant refused to accept the title thereto when it was formally tendered; therefore, in conformity with the terms of the contract, the succession was entitled to retain the deposit made thereon by the defendant.
The defendant answered and admitted signing the agreement to purchase; however, she insisted that she was entitled to withdraw therefrom for several reasons. First, because a tropical garden which was one of the property’s principal attractions had been extensively damaged by a freeze, which occurred in the month of January 1962 before title was tendered. Secondly, that a portion of a brick wall which is situated in the rear of the residence is located eight inches beyond the property line; and finally, she insisted that some of the appurtenances existing thereon encroach upon neighboring property.
Then, assuming the position of plaintiff in reconvestion, the defendant maintains that the succession was indebted unto her in an amount equal to double the deposit for having failed to comply with the agreement. Defendant in reconvention answered, denying this indebtedness.
From a judgment dismissing both the main and reconventional demands and ordering plaintiff to return the defendant’s deposit, the plaintiff has prosecuted this appeal. The defendant has answered the appeal, contending that she is entitled to liquidated damages.
The record reveals that on November 14, 1962, the defendant agreed to purchase from the-Succession of Bornemann a residence for the price of $66,000.00, which is located in 1630 Arabella Street in the City of New Orleans. Defendant deposited the sum of $6,600.00, or ten percent of the purchase price thereof, with the estate’s attorney. The agreement provided that title thereto was to'be passed on or before January 15, 1962.
Several weeks after signing the aforego-ing agreement, the defendant, very frankly admitted that she had changed her mind relative to the purchase thereof, for the simple reason that she no longer desired to leave the home in which she had resided for approximately 42 years. She then requested her son, Horace Richards, a realtor, to find another purchaser for the Arabella Street property. Unfortunately, he was unable to do so.
Early in January 1962, the defendant instructed her attorneys to examine the title to the property.
Between the dates of January 9th and 13th, the City of New Orleans experienced an unusually severe freeze, which damaged many plants and trees in this area, including a portion of the tropical garden which had been planted on the grounds of this property.
*458 On January 18, 1962, the defendant and a representative of the estate both agreed to extend the date for passage of the act of sale for an additional sixty days, that is, from January 15th to March 15th, 1962.
On March 8, 1962, defendant, through her attorneys, informed the plaintiff that she intended to withdraw from the contract. Her refusal to accept the title was principally predicated on two grounds: (1) a survey made by Adloe Orr, Jr., a civil engineer and surveyor, indicated that the rear wall was not within the boundaries of the property that the succession tendered, and (2) the January freeze had extensively damaged the garden.
On March 10, 1962, plaintiff formally placed the defendant in default by tendering title.
The trial judge concluded that the defendant had not breached the contract because the tropical garden was partially destroyed by the freeze, which afforded the purchaser the option of withdrawing her offer or of demanding a diminution of the price.
Counsel for plaintiff contends that the foregoing result reached by the lower court was erroneous, since the freeze damage could be easily remedied, thus there existed no legal reason for setting aside the agreement to purchase.
The evidence inscribed in the record fully supports this contention. It is true that the Bornemann garden contains an exquisite collection of tropical plants and vines, which do enhance the value of this property. However, the record fails to substantiate the conclusion that it was destroyed by the freeze to such an extent that it could not be easily and economically restored to its former condition.
William Kraak, an expert horticulturist who appeared on plaintiff’s behalf, testified that 99% of the garden was preserved and that 1% thereof, which was destroyed by the freeze, could be replaced at a cost of $350.00. He did state, however, that the new plants would require between six months and two years to attain the growth of those destroyed by the freeze.
Howard E. Talen, the defendant’s expert horticulturist, estimated that the freeze damage could be remedied for the sum of $901.00; however, he included in this estimate a charge in the amount of $240.00 for cleaning the yard. He specifically designated thirteen plants that had been killed, and he estimated that the freeze had destroyed 25% of the garden. He expressed the opinion that most of the new plants would require between one and two years to develop to the same extent as those that they replaced. He was also of the opinion that after replacement it would require five years time for a Coculus tree, which was located in the rear yard of the property, to attain the growth of the one destroyed by the freeze.
Since it is not disputed that the garden actually contained thousands of plants, we believe that the Kraak estimate relating to percentage of freeze damage is more accurate and reasonable than the Talen estimate. This conclusion is, to some extent, supported by the calculations of both experts to the effect that the freeze damage could be remedied by expending the respective amounts of either $350.00 or $661.00, which included the cost of both labor and materials.
In his written reasons for judgment, the trial judge stated that the garden was an accessory to the residence which was to be sold therewith. He further found that it had been partially destroyed by the freeze, which afforded the purchaser the option of withdrawing from the contract or of demanding a reduction in the purchase price. He predicated this conclusion on the rationale of LSA-C.C. Art. 2455, which reads:
“If, at the moment of the sale, the thing sold is totally destroyed, the sale is null; if there is only a part of the thing destroyed, the purchaser has the *459 choice, either to abandon the sale, or to retain the preserved part, by having the price thereof determined by ap-praisement.”
We do not believe that the redactors of the Civil Code intended that the above article should be applicable to the special facts which have been developed herein. This is so because the freeze damage to the garden can be easily and economically remedied, and in a relatively short period of time it can be restored to its former condition. We think the words “part of the thing destroyed”, as used in the foregoing article, contemplates a factual situation where the object of the sale or a portion thereof is damaged to such an extent that the condition cannot be readily or economically corrected. It will be recalled that the freeze damage was estimated at approximately one-percent of the purchase price of the property, which is insignificant in relation to the total value of both the house and ground.
We had occasion to consider a purchaser’s right to withdraw from a contract to buy real estate recently in a case entitled Stack v. Irwin[2], wherein the purchaser complained of the existence of latent defects in the premises and endeavored to withdraw therefrom on the grounds of red-hibition. Therein we reasoned that since the defects could be remedied and were not of such a nature that they affected the basic structure, the purchaser could not rescind. Although that case encompassed the subject of redhibition, we are of the opinion that the principle involved therein is applicable herein since both conditions complained of were easily and economically remedied.
In view of what we have said herein-above, we are now relegated to a consideration of whether defendant’s second reason for refusing to accept title was valid.
Defendant contends that when she inspected the property, she gained the impression that it was enclosed by a high brick wall which was an appurtenance thereto. She especially asserts that a survey of Adloe Orr, Jr., reflects that the rear brick wall is actually located eight inches beyond the property line of the residence.
Plaintiff, conversely, contends that the brick wall located in the rear of the property is, as it should be, partially within the Bornemann property measurements.
In order to fully comprehend the contentions and the testimony of the surveyors, it is necessary that we discuss briefly the history of the square and its subdivision into individual lots. The property is located in the square bounded by St. Charles Avenue, Arabella Street, Danneel Street and Nashville Avenue. Some years ago the entire square was owned by the Fab-acher family, with the exception of three lots which fronted on Arabella Street and began at the corner of Arabella and Dan-neel. The Fabachers constructed a high brick wall around their property, a portion of which is located in the rear of the present Bornemann tract, and another portion of which is presently on the side property line of the Bornemann tract. The side property line referred to is the one nearest St. Charles Avenue.
The distance existing between Arabella Street and Nashville Avenue has been established by surveyors at 240 feet. The Bornemann tract beginning at Arabella Street has a depth of 120 feet. If the side property lines of the Bornemann tract were extended through to Nashville Avenue, they would enclose a portion of lots 2 and 3 of this square, which front on Nashville Avenue.
On May 17, 1940, E. L. Eustis, a civil engineer and surveyor, made a survey of five lots in this square. His survey of lots *460 2 and 3, which front on Nashville Avenue, revealed that they had a depth of 120 feet, and this depth ended in approximately the center of a thirteen inch brick wall, the one which forms the subject matter of this dispute. In addition thereto, it reflected that the Bornemann tract possessed a depth of 120 feet, which depth also terminated in the center of the brick wall. Since the Bornemann lot in the rear abuts a portion or the rear of lots 2 and 3, his survey accommodates all titles and reveals that the rear brick wall of the Bornemann tract rests half on that tract and half on a portion of lots 2 and 3.
In addition, both lots 2 and 3 on Nashville Avenue were transferred a short time after the Eustis plat was made, both subject to the Eustis survey which indicates that the brick wall straddles the rear property lines of those lots and the Bornemann tract.
Eustis testified that when he made this survey in 1940, he ran transit lines on both Nashville and Arabella Street in order to establish a fixed point from which depths of properties fronting on these streets could be measured. He further insisted that the disputed rear brick wall is not beyond the limits of the Bornemann land. Instead, he said, the rear property line is located approximately in the center of the wall. He asserted that surveys of Adloe Orr, Jr. and Frank Stewart, experts called by the defendant, would not accommodate the titles of other tracts in the square. He stated that both surveyors placed the brick wall beyond the Bornemann property line because they used an erroneous point of beginning on Arabella Street in order to measure the depth.
Adloe Orr, Jr., who made a survey on February 23, 1962, insisted that the wall was eight inches beyond the property line and that part of the garden appurtenances encroached on the lots which abut the rear of the Bornemann tract. He did state that he was not aware of the transit line fixed by Eustis in 1940. Further, he conceded that it was difficult in some instances to establish a beginning point. Orr testified that he did not measure the depth of the lots which front on Nashville Avenue and abut the Bornemann tract in the rear. Nor does he know whether his survey would accommodate the measurements of the other lots in this square.
Frank Stewart, who made his survey on July 7, 1962, testified that the brick wall is 11 inches and six lines beyond the rear line of the Bornemann property on the St. Charles Avenue side and one foot, five inches and six lines beyond the rear line on the Danneel Street side. Stewart did not know if his survey would accommodate other titles in the square and he did not measure the depth of the lots from Nashville Avenue.
The reason why all the surveyors place the depth at different points, they all agree, is because they all use a different starting point.
Since there exists a disagreement among the surveyors, we are of the opinion that the Eustis survey should be accepted which reveals that the rear brick wall is partially on the Bornemann property line. This result is sanctioned by the rationale appearing in the case of Provosty v. Clark[3], wherein the organ for the court reasoned that it would accept the survey of a developed area that would accommodate the title of the lots in the square as they actually exist, instead of accepting surveys predicated on theoretical starting points that would not accommodate existing conditions.
While it is true that the Provosty decision involved an action to establish boundary, we are convinced that the reasoning therein should apply herein in view of the fact that the other landowners or their ancestors in title who own the property in the rear of the Bornemann tract, and who *461 are not parties to this suit, purchased their property according to a survey of E. L. Eustis, which reflects that the brick wall in dispute straddles the property line dividing the Bornemann tract from a portion of lots 2 and 3.
For the reasons assigned, the judgment appealed from is reversed, and it is now ordered adjudged and decreed that there be judgment in favor of the plaintiff, the Succession of Bornemann, and against the defendant, Mrs. Loretto McKenna Richards, in the sum of $6,600.00, which is the amount of the deposit made by defendant to plaintiff on account of the purchase price of the property.
Defendant is to pay all costs.
Reversed and rendered.

. The seller in its petition initially prayed for specific performance; however, on appeal, the succession seeks only to enforce its alternative demand, namely, the right to retain the purchaser’s deposit. The agreement to buy and sell affords the seller the option of suing for specific performance or liquidated damages in the amount of the deposit, in the event the purchaser does not comply with the terms of the agreement.

. La.App., 144 So.2d 648 (1962).

. 11 La.App. 147, 119 So. 763 (1929).